

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Norfolk Division**

**GOODRICH CORPORATION,**

      **Plaintiff,**

v.                                  **CIVIL ACTION. NO:.2:11cv529**

**BAYSYS TECHNOLOGIES, LLC,**

      **Defendant.**

## *MEMORANDUM OPINION AND ORDER*

Before the Court is Plaintiff's Motion to Dismiss Counts III and IV, as well as the portion of Count I involving Breach of the Implied Covenant of Good Faith and Fair Dealing, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Having carefully considered the parties' pleadings and the arguments of counsel at the hearing on the instant motion, the Court finds that this matter is now ripe for judicial determination. For the reasons stated herein, Plaintiff's Motion to Dismiss is **GRANTED in part and DENIED in part.**

## I. FACTUAL AND PROCEDURAL HISTORY

Plaintiff,[1] Goodrich Corporation ("Goodrich"), is a corporation organized and existing under New York state laws with its principal place of business located in Charlotte, North Carolina. Compl. ¶ 2. Defendant, BaySys Technologies, LLC ("Baysys"), is a Virginia limited liability company with its principal place of business located in Accomack, Virginia. Compl. ¶

---

[1] Plaintiff Goodrich is the Counterclaim Defendant in this case and Defendant BaySys is the Counterclaim Plaintiff.

3; *see also* Def.'s Ans. ¶ 3.[2] BaySys provides remodeling and restoration services for private

aircrafts. Def.'s Counterclaim ¶ 9. On or about January 28, 2008, BaySys entered into a

purchase order ("Initial Purchase Order") with Precision Pattern, Inc. ("PPI"), in which PPI

would provide materials and labor for the fabrication of cabinetry for a privately owned airplane,

Saudi Royal Flight Airbus A340-200 ("SRF A340"). Compl. ¶ 6. At the time of the initial

Contract, PPI was a wholly owned subsidiary of DeCrane Aerospace, Inc. ("DeCrane").

On or about September 22, 2012, Goodrich acquired assets of Decrane, including all

amounts due to PPI under the BaySys agreement. Compl. ¶ 10. Goodrich alleges that PPI

performed and provided all required labor and materials for the fabrication of cabinetry on SRF

A340 and submitted periodic invoices to BaySys outlining payment obligations. Compl. ¶ 7.

Goodrich claims PPI completed its work by June 2010 and issued its final invoice for work and

materials on July 2, 2010. Compl. ¶ 8. Goodrich further asserts that BaySys has only paid a

portion of its obligations under the agreement, despite several demands for payment dating to

August 2010. Compl. ¶ 11.

BaySys denies Goodrich's claims by alleging that PPI "woefully failed to perform its

obligations to fabricate on time and free from defects in workmanship customized cabinetry for

installation on a VIP renovation of an Airbus A340 ordered by Saudi Royal Flight."

Counterclaim ¶ 1. BaySys alleges PPI failed to meet deadlines set by the parties, causing serious

delays to the overall renovation of SRF A340 resulting in "significant damages." *Id.* BaySys

suggests that the Initial Purchase Order established a final deadline of November 2009, and that

Goodrich admits that work was not completed until July 2010. *Id.*

---

[2] BaySys claims its principal place of business is Melfa, Virginia.

BaySys concluded that part of the reason work was never completed was because DeCrane closed PPI's Savannah facility, forcing BaySys to pick up raw, unfinished components and parts to complete the job itself using substitute cabinet manufacturers and their own personnel. *Id.* According to BaySys, after PPI's Savannah facility closed, PPI refused to finish its work unless BaySys paid overtime and additional fees for its personnel to travel to BaySys' Wallops Island facility. *Id.*

BaySys alleges PPI's substandard work caused it significant damages. Counterclaim ¶ 2. BaySys maintains that the Initial Purchase Order required PPI to provide: labor to manufacture and finish the cabinetry, materials for fabrication, inlays on cabinetry and tables, composite counter tops, laminated interior of cabinetry, installation of electrical components in the cabinetry, and installation and testing of cabinet plumbing. *Id.* ¶ 13. As part of this order, BaySys alleges PPI warranted that at the time of delivery and up to twenty-four months thereafter, each item of cabinetry would be free from any defects in workmanship and would conform to the Initial Purchase Order's specifications. *Id.* ¶ 14.

BaySys claims PPI agreed to strictly comply with manufacturing specifications including PPI's own detailed High Gloss Finish Procedures. *Id.* BaySys asserts that PPI promised the fabrication time for each cabinetry product would be 20 weeks from the date of data approval by BaySys. *Id.* ¶ 15. Based on this promise, BaySys claims to have paid PPI a $1,127,963 down payment on February 4, 2008 and began providing drawings for cabinets in June 2008. Counterclaim ¶ 16. Throughout the summer and fall of 2008, BaySys claims to have devised a system through which PPI could provide reports of the status of each cabinet, including a cabinet schedule, and in which BaySys could schedule other modifications based on the timing of

3

receipts of PPI. *Id.* ¶ 17. BaySys claims PPI agreed to have a number of cabinets finished by mid-December 2008. *Id.* Despite no delivery by that time, BaySys asserts PPI granted assurances of completion. Based on those assurances, BaySys paid the second installment of $488,784.14 on December 16, 2008. *Id.* ¶ 18.

However, BaySys contends that PPI failed to meet this deadline and instead delivered a "limited number of cabinets" in March 2009. *Id.* ¶ 19. Despite this, BaySys approved PPI's Overtime Labor Charges of over $41,000, allegedly to "keep PPI's production moving forward to meet the now mid-May deadline." Counterclaim ¶ 20. However, BaySys claims that the April/May deliveries had "finishing issues so severe that BaySys could not fix them itself," resulting in BaySys sending the cabinets back to PPI for repair. *Id.* ¶ 21. Afterwards, BaySys President Steve Walton ventured to the PPI facilities in Georgia to discuss the continued delays at the PPI factory and to inform PPI that the delays adversely affected BaySys' redelivery time for the SRF A340. *Id.* BaySys subsequently approved additional overtime labor payments and paid another installment of $350,000. *Id.* ¶ 22.

For approximately five weeks from June to July 2009, BaySys was forced to close its Wallops Island plant based on cash flow problems caused by "delinquencies by another BaySys customer." *Id.* ¶ 23. PPI then shut down its work on SRF A340 and following BaySys' return to operation, refused to continue work until BaySys paid all pending overtime and contract change orders PPI issued. *Id.* BaySys claims PPI further demanded early payments of the next two installments under the initial performance order, which otherwise would not have been due until performance was 80% complete. BaySys asserts that it made this payment in the amount of $834,993.29 on August 26, 2009. Def.'s Counterclaim ¶ 23.

4

In September 2009, the parties decided to modify the Initial Purchase Order. *Id.* ¶ 24. BaySys agreed to send an on-site manager and additional engineers to PPI's Savannah facility. *Id.* In exchange for PPI's commitment to complete its work by November 11, 2009, BaySys paid 50% of the remaining balance due, a portion of the PPI cost overruns to date, and PPI's estimated overtime charges to complete the balance of the cabinetry work by the agreed final deadline of November 11, 2009. *Id.* Additionally, PPI promised to devote sufficient manpower to the cabinetry and provide daily and weekly reports. *Id.* ¶ 25. However, BaySys contends that PPI had delivered only 35% of the cabinets by the agreed upon deadline in mid-November 2009. *Id.* Because so many of the cabinets were "critical path items," BaySys submits that PPI's delays backed up the entire SRF A340 project and created significant delay penalties for BaySys. Counterclaim ¶ 26.

According to BaySys, PPI's untimeliness was compounded by the fact that by May 2010, 65% of PPI's components parts had defects. *Id.* ¶ 27. BaySays declares that because of these delays and deficiencies, it was forced to hire other contractors to repair and complete the remaining cabinets. *Id.* ¶ 31. As a result, the cabinets were not completed until October 12, 2010, nearly eleven months after the parties' revised final deadline of November 11, 2009. *Id.* ¶ 33.

On September 27, 2011, Plaintiff filed a Complaint in this Court alleging breach of contract for BaySys' failure to pay for materials and labor provided as part of the renovations of SRF A340 in the amount of $1,129,055.20 plus interest from July 15, 2010, late charges, and attorneys' fees. Defendant denies these allegations and counterclaims alleging breach of contract (Count I), breach of express warranty (Count II), breach of implied warranty (Count III), and

tortious interference with contract (Count IV).

On January 3, 2012, Goodrich filed the instant Motion to Dismiss. The Court held a hearing on June 6, 2012.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of actions that fail to state a claim upon which relief can be granted. For purposes of a Rule 12(b)(6) motion, courts may rely only upon the complaint's allegations and those documents attached as exhibits or incorporated by reference. *See Simons v. Montgomery Cty. Police Officers*, 762 F.2d 30, 31 (4th Cir. 1985). Courts will favorably construe the allegations of the complainant and assume that the facts alleged in the complaint are true. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). However, a court "need not accept the legal conclusions drawn from the facts," nor "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Eastern Shore Mkts., Inc., v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000).

In determining these motions, courts must be mindful of Rule 8, which only requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8. Rule 8 does not require that a complaint contain "detailed factual allegations" in order to survive a motion to dismiss, but the complaint must incorporate "enough facts to state a belief that is plausible on its face." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949-50 (2009).

6

### III. DISCUSSION

#### A. Breach of the Implied Covenant of Good Faith and Fair Dealing

Goodrich contends that BaySys' counterclaim for the Implied Covenant of Good Faith and Fair Dealing must fail because the "the breach of the implied duty gives rise only to a cause of action for breach of contract." Mem. Supp. 8 (citing *Charles E. Brauer Co., Inc. v. NationsBank of Va., N.A.*, 466 S.E.2d 382, 385 (Va. 1996). BaySys argues that it has not asserted a separate cause of action for breach of implied duty but that the breach of implied duty is a vehicle for a breach of contract claim. Therefore, it does not stand as an independent action. Mem. Opp. 8.

Goodrich correctly asserts that the failure to act in good faith does not constitute an independent tort. *See Charles E. Brauer Co.*, 466 S.E.2d at 385; *see also Allaun v. Scott*, 59 Va. Cir. 461, 465 (2002). However, Goodrich's repeated breaches of its unambiguous performance obligations are detailed in the counterclaim as giving rise to one of two breach of contract theories (with the failure to perform). Mem. Opp. 10. Under Virginia law, every contract contains an implied covenant of good faith and fair dealing. Va. Code Ann. § 8.1A-304 ("Every contract or duty within the Uniform Commercial Code imposes an obligation of good faith in its performance and enforcement."); *see also Charles E. Brauer Co.*, 466 S.E2d at 385.

After reviewing the pleadings, the Court concludes that the breach of the implied duty of good faith and fair dealing is sufficiently plead as a mechanism through which PPI allegedly breached its contract with BaySys. BaySys does not allege the breach of the implied duty of good faith and fair dealing as a separate count within their counterclaims. It is incorporated under the umbrella of a breach of contract claim. Therefore, the Court does not view the

7

allegations of the breach of the implied duty of good faith and fair dealing as an independent tort.

Goodrich maintains that where "parties to a contract create valid, binding rights, an implied covenant of good faith and fair dealing is inapplicable to those rights." Mem. Supp. 8 (citing *Ward's Equip. v. New Holland N. Am.*, 493 S.E.2d 516 (Va. 1997); *Will & Cosby Assocs. v. Salomonksy*, 48 Va. Cir. 500 (Va. Cir. Ct. 1999)). This rule, followed by the United States Court of Appeals for the Fourth Circuit and by the courts of the Commonwealth of Virginia, is only applicable if a plaintiff (here counterclaim Plaintiff BaySys) is seeking redress through an implied covenant merely to curtail a defendant's unfavorable exercise of its *explicit contractual rights*. *Enomoto v. Space Adventures, Ltd.*, 624 F.Supp.2d 443, 450 (E.D. Va. 2009); *Virginia Vermiculite, Ltd. v. W.R. Grace & Co.*, 156 F.3d 535, 542 (4th Cir.1998) ("[I]t is a basic principle of contract law in Virginia, as elsewhere, that although the duty of good faith does not prevent a party from exercising its explicit contract rights, a party may not exercise contractual *discretion* in bad faith, even when such discretion is vested solely in that party") (emphasis added). There is no evidence that BaySys attempts to curtail any explicit contractual rights of Goodrich (or PPI) in the performance of the contract.

BaySys alleges that not only did Goodrich fail to meet its performance obligations, but its actions amounted to bad faith, "over and above its performance shortcomings" in the actual performance of its duties. Mem. Opp. 9. Specifically, BaySys contends that Goodrich's failure to complete the work within the agreed upon time frame, refusal to complete work during BaySys' shutdown, refusal to resume work once BaySys' shutdown ended, false repeated assurances of completion within a two month time frame, failure to commit workforce, and shutdown prior to performance completion all evidence Goodrich's bad faith. *Id.* Moreover,

8

BaySys alleges that PPI asked for payments before dates set forth in the contract as well as payments that were not explicitly contained within the contract.[3]  *Id.*  In the pleadings submitted to the Court on the motion to dismiss, Goodrich never explicity denies that PPI demanded early payment of some funds.  It instead claims, without providing the Court with the bases of its arguments, that BaySys' contention is "barred by the principles of estoppel, release, and waiver." Mem. Supp. 3.

### 1. Estoppel

"Because the doctrine of equitable estoppel prevents the showing of the truth, it is applied rarely and only in extraordinary circumstances." *Anderson v. Cox*, 977 F. Supp. 413, 415-16 (W.D. Va. 1997) (citing *Princess Anne Hills Civic League, Inc. v. Susan Constant Real Estate Trust*, 413 S.E.2d 599, 603 (Va. 1992)).  Courts apply the doctrine of estoppel based on fairness. *Anderson*, 977 F. Supp. at 416.  Without more, the Court will assume, *arguendo*, that Goodrich contends that it would be unfair to permit BaySys to rest its claims on a "harm" BaySys suffered only because it agreed to pay extra-contractual payments to PPI.

There is nothing about the facts of this case that warrants the application of the seldom-used principles of estoppel.  Goodrich has not provided the Court with any evidence of detriment it may have suffered nor any evidence that BaySys benefitted unjustly.  Consequently, the Court declines to apply the principles of estoppel to this case.

---

[3] BaySys asserts that the demands for additional payments were made with the knowledge that BaySys was "under intense pressure to meet its redelivery schedule to the ultimate customer, SRF." Mem. Opp. 4.

### 2. Release

There is no evidence of a release in this case. "In general, to show the initial validity of a release, a party must show that there was some dispute between the parties, that the release was signed and executed settling the dispute, and that consideration was given in return for the release." *See Pennsylvania Life Ins. Co. v. Bumbrey*, 655 F. Supp. 1190, 1194-95 (E.D. Va. 1987) (internal citations omitted); *see also Corbin on Contracts*, Vol. 13 § 67.9 (2003) ("A release is a writing manifesting an intention to discharge another immediately, or upon the occurrence of a condition, from an existing or an asserted duty.") (internal citations omitted). No such writing or formal release has been provided to the Court. Accordingly, Goodrich's invocation of the defense of release is improper.

### 3. Waiver

Section 1-306 of the Uniform Commercial Code ("U.C.C.") provides: "A claim or right arising out of an alleged breach may be discharged in whole or in part without consideration by agreement of the aggrieved party in an authenticated record." U.C.C. § 1-306.[4] In this case, there is no such evidence that any authenticated record exists.[5]

The principle of waiver may also exist in instances where parties have attempted but failed to modify or rescind a contract. "Although an attempt at modification or rescission does

---

[4] Goodrich has not informed the Court of which portion of the Uniform Commercial Code applies to their waiver argument.

[5] The official comments of this section define authenticating the record as "(i) signing a record that is a writing or (ii) attaching to or logically associating with a record that is not a writing an electronic sound, symbol or process with present intent to adopt or accept the record." Goodrich has not provided the Court with any basis for concluding that such authentication occurred.

not satisfy the requirements of subsection (2) or (3), it may operate as a waiver." U.C.C. § 2-209.

The alleged payments that Goodrich argues serve as a waiver occurred in August 2009.

Counterclaim ¶ 23. There is no evidence that the parties attempted to modify or rescind the

contract prior to the exchange of the funds in August 2009. In fact, an actual modification of the

Initial Purchase Order took place in September 2009. *Id.* at ¶ 24. Therefore, the Court finds no

basis on which to infer that the August 2009 payment was the result of a failed attempt to modify

or rescind the Initial Purchase Order.

Goodrich's waiver claim fails under both sections 1-306 and 2-209 of the U.C.C.

Therefore, Goodrich cannot allege that BaySys has effectively waived its right to object to

Goodrich's purported demand for early and extra payments.

BaySys has sufficiently plead factual allegations which may constitute a breach of the

implied duty of good faith and fair dealing thereby giving rise to a breach of contract claim and

subsequent relief. Plaintiff's Motion to Dismiss this portion of Count I is **DENIED.**[6]

---

[6] At the hearing, counsel for Defendant argued that he would file, with the Court's permission, a motion to amend Defendant's Answer and Counterclaims to plead the Breach of Implied Duty of Good Faith and Fair dealing as a separate contractual cause of action. However, it is clear to the Court that the breach of the implied covenant of good faith and fair dealing should only stand as a vehicle for breach of contract. Therefore, the current Counterclaim, which alleges breach of contract and implied duty of good faith and fair dealing as one of several theories for breach of contract is sufficient. In *Levinson,* the court denied a motion to dismiss a claim grounded in the breach of the covenant of good faith and fair dealing. *Levinson v. Massachusetts Mutual Life Ins. Co.,* 2006 U.S. Dist. LEXIS 83397, at *39 (E.D. Va. Nov. 9, 2006). However, the overarching count under which this claim was brought was for breach of contract. *Id.* at *9 ("Plaintiffs seek legal and equitable relief on the following nine counts: . . . (2) Breach of express and implied contract. . . ."). Similarly, the Court will permit the claim as a theory for breach of contract.

11

## B. Breach of Implied Warranty (Count III)

Goodrich contends that the Breach of Implied Warranty claim must be dismissed because all implied warranties were effectively excluded from the express agreement. Mem. Supp. 5-6. Under Virginia law, to exclude the implied warranty of fitness,[7] the disclaimer language may be general but it must be in writing and conspicuous. Va. Code Ann. § 8.2-316(2). BaySys posits that the disclaimer was not conspicuous and thus ineffective. Mem. Opp. 11. Alternatively, in the event that the Court finds the disclaimer language is conspicuous, BaySys claims that a sufficient and valid cause of action remains because the "express warranty failed its essential purpose" in providing a remedy in curing defective products, and thus it must give way to general remedies under the U.C.C. *Id.* at 13-14.

### 1. Conspicuousness of the Implied Warranty Disclaimer

Section 8.2-316(10) of the Virginia Code defines conspicuous as follows:

(10) "Conspicuous" with reference to a term, means so written, displayed, or presented that a reasonable person against whom it is to operate ought to have noticed it. Whether a term is "conspicuous" or not is a decision for the court. Conspicuous terms include the following:

> (A) a heading in capitals equal to or greater in size than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same or lesser size; and

> (B) language in the body of a record or display in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from surrounding text of the same size by symbols or other marks that call attention to the language.

However, where the language is of the same size, color, and style as the other provisions

---

[7] Counsel for BaySys clarified that the only implied warranty BaySys is alleging is fitness for a particular purpose.

of the contract, and no other section explicitly calls attention to it, then the provision fails to meet

the standard of conspicuousness. *Lacks v. Bottled Gas Corp.*, 205 S.E. 2d 671, 673 (Va. 1974).

Goodrich concedes that the exclusion was only contained within the text of the terms and

conditions under the bolded heading of "Warranty". Reply Supp. 5. The warranty provides, in

pertinent part, that:

> Notwithstanding any provision in this agreement to the contrary, the remedies set forth in
> this section or in this agreement for PPI's breach of warranty or other commitments set
> forth in this section are BaySys Technologies, and BaySys Technologies' customer's, as
> the case may be, exclusive remedies for such breaches. There are no other warranties or
> remedies concerning the matters set forth int his section, express or implied, including
> without limitation any warranties of merchantability or fitness for purpose. No variation
> or extension of this warranty or remedies shall be binding unless signed by a duly
> authorized representative of PPI.

*See* Compl. Ex. A at 3.

In *Lacks*, the Virginia Supreme Court encountered a similar express warranty disclaimer

and determined that the disclaimer did not meet the statutory definition of 'conspicuous.' 205

S.E.2d at 673. Specifically, the court reasoned that the "method of calling attention to a term

sanctioned by [§] 8.1-201(10) has not been followed." *Id.* Such is the case regarding PPI's

disclaimer. The express warranty at issue in this case was contained within the sixth paragraph

of a seven paragraph section on warranties. It was not in any different size, color, or font than

the rest of the warranty provisions contained within the Initial Purchase Order. In fact, the

language contained within the Initial Purchase Order presented to the Court is in a small font.

Nothing about the display or presentation of the warranty makes it conspicuous as a matter of

law.[8]

---

[8] Goodrich further claims that where two sophisticated merchants are involved, other
factors such as "the relative bargaining power, the sophistication of the parties, and whether the

## 2. Failure of the Express Warranty to Meet its Essential Purpose

Even if the implied warranties were disclaimed, BaySys has sufficiently pled a valid claim that the express warranty failed its essential purpose. Mem. Opp. 13. BaySys relies on Va. Code Ann. 8.2-719(2) which states that "where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this act." Official Comment 1 sheds more light on this provision stating, "where an apparently fair and reasonable clause because of circumstances fails in its purpose or operates to deprive either party of the substantial value of the bargain, it must give way to the general remedy provisions of this Article." Va. Code § 8.2-719 official cmt. 1 (2001).

Based on the express warranty language agreed upon by the parties, any defect in workmanship or failure to conform to BaySys' specifications would require PPI to repair or replace the non-conforming product as well as cover the cost of shipment for such products. Mem. Supp. 8. However, BaySys alleges that PPI repeatedly failed to meet its obligation of defect-free timeliness in completion. BaySys asserts that sixty five percent of PPI's cabinets failed quality control inspections before PPI ultimately stopped work on the BaySys project prior

---

purchaser had actual awareness of the disclaimer" should be analyzed. Reply Mem. 6 (citing *ACMA USA, Inc. v. Surefil, LLC*, No. 3:08-CV-071-HEH, 2008 U.S. Dist. LEXIS 88398, at *24-25 (E.D. Va. Oct. 31, 2008)). In applying Michigan law, the *ACMA* court concluded that "[r]egardless of its conspicuousness, a warranty disclaimer is fully enforceable when a purchaser has 'actual awareness' of the disclaimer . . . . " 2008 U.S. Dist. LEXIS 88398, at *25. Even if the Court were to adopt Michigan law, the parties in *ACMA* were at the summary judgment stage of litigation and ACMA proffered deposition testimony of Surefil's purchasing auditor in which he admitted to rigorously reviewing the terms. *Id* at *26. In this case, at the 12(b)(6) stage, no such admissions exist. The Court concludes that a determination of BaySys "actual awareness" is more properly addressed in a Motion for Summary Judgment after the record has been established more fully. On the facts as they are currently plead, the parties have not provided the Court with sufficient evidence to determine whether BaySys had actual awareness of the terms.

to completion. Mem. Opp. 14. As a result, BaySys claims it used its own subcontractors to correct PPI's deficiencies, which PPI was contractually obligated to repair. *Id.*[9]

BaySys avers that PPI's inability to fully perform the agreed upon remedy for defective work has deprived BaySys of a substantial value of the bargain. *Id.* BaySys cites to *Beausoleil v Peterbilt Motors Co.*, No. 3:10CV222-HEH, 2010 WL 2365567, at *3 (E.D. Va. June 11, 2010), a case heard in this district in which the purchaser signed an express warranty limiting remedies to repair of the defective products. In *Beausoleil*, the court denied defendant's motion to dismiss because despite the limited express warranty, the seller failed to repair plaintiff's truck after seven attempts and over thirty days had elapsed. *Id.* Based on this, the court found that the plaintiff had sufficiently pled allegations supporting the reasonable inference that the defendant was liable for the misconduct alleged. *Id.*

Goodrich attempts to differentiate the facts of the instant case from *Beausoleil* by asserting that, in *Beausoleil*, the truck *could not be fixed* whereas here BaySys failed to sufficiently plead that the remedy failed its essential purpose after attempting multiple repairs. Mem. Rep. 10. However, taking BaySys' allegations to be true, BaySys was effectively required to correct deficiencies which PPI was contractually obligated to correct. Such deficiencies would have deprived BaySys of substantial value in their bargain with PPI. The essential purpose of the warranty–to provide BaySys with a remedy regarding non-conforming product–failed. Furthermore, PPI stopped work in June 2010, prior to the completion of the agreement. Because

---

[9] At the hearing, counsel for Goodrich argued that BaySys never took advantage of the express warranty provisions. Counsel for BaySys countered, however, by arguing that BaySys attempted to make Goodrich aware of their failings in real time. Because the products were not properly fixed, BaySys maintains that the express warranty failed its essential purpose.

BaySys had to pay for and correct deficiencies in non-conforming products, the express warranty failed its essential purpose. Therefore, BaySys' complaint sufficiently alleges that the warranty may have failed its essential purpose. Plaintiff's Motion to Dismiss Count III is **DENIED.**

## C. Tortious Interference (Count IV)

Finally, Goodrich argues that BaySys' claim that PPI tortiously interfered with BaySys' contract with SRF must fail because it is barred by the economic loss rule and because BaySys has not stated a claim for tortious interference under Virginia law. Mem. Supp. 10-11; *see also* Reply 14-15.

Under the economic loss rule, "losses suffered as a result of the breach of a duty assumed only by agreement, rather than a duty imposed by law, remain the sole province of contracts." *Filak v. George*, 594 S.E.2d 610, 613 (Va. 2004) (citing *Sensenbrenner v. Rust, Orling & Neal, Architects, Inc.*, 374 S.E.2d 55, 58 (Va. 1988). In reaching a determination of whether a party has sufficiently pled a tort claim and not a contract claim, "[t]he relevant question here, then, is whether the source of the violated duty sounds in contract or tort." *Pre-Fab Steel Erectors v. Stephens*, No. 6:09-cv-00039, 2009 WL 891828, at *8 (W.D. Va. Apr. 1, 2009).

Goodrich contends that BaySys' claims are barred by the economic loss rule. However, none of the precedent to which Goodrich cites for the proposition that the economic loss rule bars tort claims mandates a complete bar on torts. More specifically, it does not warrant a complete bar on intentional torts such as tortious interference of contract. In fact, the majority of the cases that Goodrich provided the Court addressed tort claims for negligence. *See, e.g., Dur v. W. Branch Diesel, Inc.*, 240 F'Appx. 568, 571 (4th Cir. 2007) ("The sole cause of action in this case is Plaintiff's negligence cause of action against Subcontractor under Virginia substantive law.");

*Filak*, 594 S.E.2d 610 (sustaining a demurrer to a constructive fraud claim that essentially alleged

negligent performance of contractual duties); *Gerald M. Moore & Son, Inc. v. Drewry*, 467

S.E.2d 811, 813 (Va. 1996) (holding "in the absence of privity, a person cannot be held liable for

economic loss damages caused by his negligent performance of a contract. . . .").

"A party can, in certain circumstances, show both a breach of contract and a tortious

breach of duty." *Richmond Metro. Auth. v. McDevitt Street Bovis, Inc.*, 507 S.E.2d 344, 347 (Va.

1998) (internal citation omitted). "Under Virginia law, a tort claim normally cannot be

maintained in conjunction with a breach of contract claim. An exception arises where a party

establishes an independent, willful tort that is factually bound to the contractual breach but whose

legal elements are distinct from it." *Erdmann v. Preferred Research, Inc.*, 852 F.2d 788, 791

(4th Cir. 1988) (internal citations omitted).

Goodrich argues that the source of the duty in this case arises because of the contractual

agreement between PPI and BaySys. BaySys counters by arguing that Goodrich misconstrues its

claim by "conflat[ing] PPI's contractual obligation to perform its own contract with BaySys with

PPI's independent common-law duty not to intentionally interfere with BaySys' separate and

distinct contract with SRF." Opp'n 15.

To properly adjudicate the question of whether this action is based in contract or in tort,

the Court must first determine if BaySys' allegations are based on PPI's nonfeasance (omissions

which sound in contract) or malfeasance (actions which sound in tort). *See Rich. Metro. Auth.*,

507 S.E.2d at 344 ("If the cause of complaint be for an act of omission or non-feasance which,

without proof of a contract do what was left undone, would not give rise to any cause of action

(because no duty apart from contract do to what is complained of exists) then the action is

17

founded upon contract, and not upon tort."). In other words, the Court must find actions of malfeasance in order to conclude that an action sounds in tort. *Insteel Indus., Inc., v. Costanza Contracting Co., Inc.*, 276 F. Supp. 2d 479, 485 (E.D. Va. 2003).

At the hearing, as the basis upon which BaySys hinges its claim for tortious interference, BaySys cited to PPI's knowledge that BaySys was under duress and PPI's knowledge of BaySys' untenable position. The source of this alleged violated duty, however, harkens back to BaySys' contractual claims. Based upon the evidence before the Court, no actionable tortious claim (i.e., fraud) exists.

BaySys has not provided the Court with a sufficient act of malfeasance outside of PPI's contractual obligations to properly show that this particular action is one that sounds in tort, not contract. Therefore, because BaySys has not sufficiently plead a tortious violation, its claim is barred by the Economic Loss Rule.

Accordingly, Plaintiff's Motion to Dismiss Count IV is **GRANTED.**

### IV. CONCLUSION

For the reasons stated above, Plaintiff's Motion to Dismiss a portion of Count I and Count III is its entirety is **DENIED.** Plaintiff's Motion to Dismiss Count IV is **GRANTED.** Count IV is hereby dismissed. The Court **DIRECTS** the Clerk to send a copy of this Order to the parties.

**IT IS SO ORDERED**.

Norfolk, Virginia
June  // , 2012

/s/
Raymond A. Jackson
United States District Judge

18